**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ISABEL RUBINAS and ) <br> IJR CORP., ) <br> ) <br>     Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> NICOLAS MADUROS, DIRECTOR OF THE ) <br> CALIFORNIA DEPARTMENT OF ) <br> TAX & FEE ADMINISTRATION, ) <br> ) <br>     Defendant. ) | No. 1:21-cv-00096 <br><br> Judge Edmond E. Chang |

**MEMORANDUM OPINION AND ORDER**

Isabel Rubinas owns and operates a children's clothing business from her kitchen table in suburban Illinois. R. 1, Compl. ¶ 5.[1] Most of her sales are made online through Amazon.com. *Id.* She now faces a California tax bill for the sales she made in years past to California customers. Rubinas seeks declaratory and injunctive relief to prevent California's Department of Tax & Fee Administration from collecting taxes on those sales. (The co-Plaintiff in the lawsuit is the formal corporate entity through which she operates the business, *id.* ¶ 12, but for convenience's sake, the Court will refer just to Rubinas unless otherwise explained.) Rubinas has moved for a temporary restraining order and a preliminary injunction, asking this Court to order California to return money seized from her bank account and to prohibit the State from seizing any more of her funds during the pendency of this litigation.

---

[1]Citations to the docket are denoted as "R." followed by the docket entry number.

On the threat of prospective seizures, California has represented and confirmed to the Court that the State has no immediate plans for further levies against Rubinas's bank account. The State also promises to give a 14-day heads-up warning before it changes course and attempts to levy the account. So right now there is no need for a TRO against future levies. That leaves the question of whether to grant a TRO requiring California to return the already-seized money to Rubinas.

On January 14, 2021, the Court denied the TRO motion for return of the funds. This is the Opinion that explains the motions' denial. Although this case presents important questions of economic fairness and tax law, federal law constrains the Court's authority: under the Tax Injunction Act, no federal court may "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy[,] and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. As detailed below, California does offer a plain, speedy, and efficient remedy, so the Tax Injunction Act prevents this Court from issuing the relief that Rubinas seeks.

## I. Background

For purposes of the TRO motion, the key facts are largely undisputed. Isabel Rubinas owns and operates IJR Corporation, which does business as Lollipop Seeds. R. 1-2, Exh. 2, Rubinas Declaration ¶2. Lollipop Seeds sells children's clothing, and Rubinas runs the business out of her home in Glen Ellyn, Illinois. *Id.* She conducts most of her business over Amazon.com, through its Fulfilled by Amazon program. *Id.* ¶ 3. Under the program (which is widely known by the acronym FBA), once Amazon

accepts a listing for clothing offered by Rubinas, Amazon then directs Rubinas to ship the clothing for storage in an Amazon warehouse. *Id.* ¶ 3. After Rubinas ships her products to Amazon, she has no control over where they are stored or where they are sold. *Id.* For example, Amazon can ship the clothing to other warehouses across the country, with no say-so in the matter by Rubinas. *Id.* After the products are listed on Amazon, Amazon also takes over the processing of any sales, including shipping the products to customers and receiving the payments from customers. *Id.* ¶ 4. Indeed, when the customers pay, the money goes to Amazon first; Rubinas receives her cut of the sale only after Amazon deducts its profit, fees, and so on. *Id.* On the back-end of the sale, almost all customer service is handled by Amazon: "Amazon also generally prevents me from contacting consumers directly so that Amazon can control the customer relationship." *Id.*

Until recently, neither Rubinas nor Amazon collected California sales and use tax on any of the products that she sold. *See* Rubinas Decl. ¶ 7. According to the Complaint, in 2012, California initially announced that it would require Amazon to collect sales and use tax on FBA sales, but then the State reversed that position. Compl. ¶¶ 32-33. It was not until July 2019, Rubinas says, that she first learned from California that she would be required to collect use tax on her California sales. Rubinas Decl. ¶ 5.[2]

---

[2]California asserts that it actually emailed a notice to Rubinas in February 2019, and then began back-and-forth emails and phone calls with her. R. 12-1, Hale Declaration, ¶¶ 2–4. This difference in timing does not make a difference to the decision on the motion.

After Rubinas learned about the tax obligation, she paid the assessed use tax of over $2,600 for tax year 2019. Rubinas Decl. ¶ 9. In January 2020, Rubinas's accountant also prepared and filed sales-and-use tax returns for 2017 and 2018. R. 12-1, Hale Declaration ¶ 5. Before filing those tax returns, IJR Corporation had submitted to California a Power of Attorney form authorizing the accountant to act on the company's behalf. *Id.* ¶ 6. Based on the filed tax returns, Rubinas's business owed $2,621 for the 2017 tax year and $4,630 for the 2018 tax year. *Id.* ¶ 5. Sometime after the January 2020 submission of the tax returns, Rubinas informed an employee of the California Department of Tax and Fee Administration, Shannon Hale, that Rubinas would not be able to pay the assessed taxes. *Id.* ¶ 7. Hale emailed Rubinas with information about the Department's payment-plan options. *Id.* The two spoke on the phone on March 2, 2020, and Rubinas said that she would call Hale the next day to set up a payment plan. *Id.* But Rubinas did not call. *Id.*

According to Rubinas, she "lost touch" with Hale during the 2020 pandemic. Rubinas Decl. ¶ 9. But that is not the complete picture: in fact, on July 27, 2020, Hale called Rubinas and set up a phone call for August 4 to begin arrangements for a payment plan. Hale Decl. ¶ 8. Rubinas did not answer the phone at the appointment time, and then did not respond to Hale's voicemail reminder. *Id.*[3]

On December 1, 2020, Hale called Rubinas and left a voicemail saying that IJR needed to pay its tax debt or enroll in a payment plan by December 4, or else

---

[3]At the motion hearing held on January 12, 2021, Rubinas' counsel acknowledged that Rubinas does not contest the facts presented in Hale's declaration (though Rubinas does contest their relative importance).

4

California would pursue collection mechanisms. Hale Decl. ¶ 9, Rubinas Decl. ¶ 8. On December 8—apparently without further notice to Rubinas—California issued a levy on IJR's Chase bank account. Hale Decl. ¶ 12. The Department did not immediately apply the levy to Rubinas's tax debt, because she could have challenged the levy or requested a hardship hearing. *Id*. ¶ 12. On December 18, California issued a notice of the levy to IJR. *Id*. ¶ 13. The next day, on December 19, Rubinas received a notice from Chase reporting that her account had been frozen up to the levied amount based on California's levy notice. Rubinas Decl. ¶ 9. Two days later, California received $2,367.56 from the account. *Id*. On December 28, another Department employee emailed Rubinas's accountant and left him a voicemail about payment-plan options and compromise offers. Hale Decl. ¶ 13. In response, the accountant submitted a revocation of the Power of Attorney authorization, so the Department directly contacted Rubinas (on December 30) about her options. *Id*. ¶ 14. She did not respond. *Id*. On January 7, 2021, the Department applied the levied funds to Rubinas's account. *Id*. ¶ 15.

As explained earlier, Rubinas has moved for a temporary restraining order and preliminary injunction, asking this Court to stop California from issuing further levies and to require the State to return the already-seized funds. Rubinas faced a looming payment date of January 15, when Amazon would attempt to withdraw monthly storage fees from her Chase bank account, and she did not have enough funds in the account to cover it. Rubinas Decl. ¶ 12. As a result, according to Rubinas, Amazon will be able to "seize [her] inventory and sell it for pennies on the dollar." *Id*. At the

5

January 12 motion hearing, Rubinas's counsel acknowledged that the timeline for an inventory seizure and sale is not clear and might not be immediate. California also confirmed that it had no immediate plans for a further levy on the bank account and would provide at least 14 days' notice in advance of attempting to serve another notice of levy on the account.

## II. Standard of Review

The general test for obtaining a temporary restraining order starts with requiring the plaintiff to show that she will suffer immediate irreparable harm, has no adequate remedy at law, and her claims are likely to succeed. Fed. R. Civ. P. 65(b)(1)(A); *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008) (preliminary-injunction factors); *Girl Scouts of Manitou Council v. Girl Scouts of USA*, 549 F.3d 1079, 1086–87 (7th Cir. 2008) (same). To win an *ex parte* TRO, the plaintiff also must show that the immediate irreparable injury "will result to the movant before the adverse party can be heard in opposition" and that notice to the defendant should not be required. Fed. R. Civ. P. 65(b)(1)(A), (B). If the plaintiff can meet those requirements, then before issuing a TRO, the Court would still have to balance, on a sliding scale, the nature and degree of the plaintiff's injury, the likelihood of prevailing, the possible injury to the defendants if the TRO is granted, and the public interest. *Girl Scouts*, 549 F.3d at 1086-87.

## III. Analysis

There is no doubt that this case presents challenging questions of tax law and fundamental fairness. But Rubinas's claims for return of the already-seized funds

6

cannot succeed because this Court lacks subject matter jurisdiction to hear them. The California state court system—and ultimately the United States Supreme Court—is where Rubinas must present her claims. So the motion for a temporary restraining orders fails on the threshold element of likelihood of success.

### A. The Tax Injunction Act

The Tax Injunction Act is concise (relative to most federal laws) and dispositive in this case: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy[,] and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. A state court remedy must meet "certain minimal *procedural* criteria" to suffice under the statute. *Rosewell v. LaSalle Nat. Bank*, 450 U.S. 503, 512 (1981) (emphasis in original). A state remedy is procedurally adequate if it "provides the taxpayer with a full hearing and judicial determination at which she may raise any and all constitutional objections to the tax." *Rosewell*, 450 U.S. at 514 (quotation omitted).

Each of the three statutory requirements—plain, speedy, and effective—has received individual attention from the courts. A remedy is "plain" when it is clearly available to the party seeking it. *Lowe v. Washoe Cty.*, 627 F.3d 1151, 1156 (9th Cir. 2010). A remedy is "speedy" if it does not take significantly longer than federal remedies. *Hyatt v. Yee*, 871 F.3d 1067, 1073 (9th Cir. 2017) (cleaned up).[4] It is "efficient

---

[4]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

unless it imposes an unusual hardship requiring ineffectual activity or an unnecessary expenditure of time or energy." *Id.*

Exceptions to the anti-injunction effect of the Act's must be "construe[d] narrowly" to give effect to congressional intent. *California v. Grace Brethren Church*, 457 U.S. 393, 413 (1982). State courts need not provide a perfect or taxpayer-favorable remedy—only one that meets the requirements of the Act: "To satisfy these requirements, a remedy need not necessarily be the best remedy available or even equal to or better than the remedy which might be available in the federal courts." *Hyatt*, 871 F.3d at 1073.

Rubinas argues that the Act does not apply because the remedy available to her in California courts is not plain, speedy, and efficient. For purposes of the TRO motion in particular, the best argument that Rubinas has is that California does not provide for injunctive relief in the form of a provisional order—like a TRO or preliminary injunction—requiring a return of already-seized funds. It is true that California's Constitution prohibits its state courts from issuing declaratory or injunctive relief against tax collection, and only permits the legislature to authorize refund suits. Cal. Const., art. XIII, § 32. Before filing a refund suit, a party must first file a refund claim with the California Department of Tax and Fee Administration as required by California Revenue and Taxation Code § 6902(a)(1), (a)(2). This procedure is available to "persons required to file returns." *Id.* After the refund request is denied, the taxpayer can file a refund suit in the state courts in a process governed by §§ 6931–37 of the Revenue and Taxation Code. In the refund lawsuit, the taxpayer can raise federal

8

constitutional claims: "the state court can review taxpayers' arguments and evidence regarding the allegedly unconstitutional and erroneous tax assessment if taxpayers first raised them in their claim for a refund." *Jerron West, Inc. v. State of Cal., State Bd. of Equalization*, 129 F.3d 1334, 1339 (9th Cir. 1998).

Rubinas contends that California's remedy is inadequate under the Tax Injunction Act because the State requires her to pay the assessed taxes first, and only then can she seek a refund through state court. R. 6, Pl. Brief at 9. Under this pay-first system, she argues, the "best she could hope for is a delayed return of any money she surrenders, which will destroy her business and her rights." *Id.* Although the Court recognizes the practical obstacle that the pay-first model poses, Rubinas cites no case in which a federal court has held that a state's remedial system was inadequate under the Act simply because the state failed to offer injunctive or declaratory relief. Indeed, Rubinas's argument runs head-long into the line of precedent that specifically deems California's tax-refund system adequate under the Act. The United States Supreme Court and the Ninth Circuit have held that refund-challenge remedies in general—and specifically in California—do provide an adequate process under the Act.

The Ninth Circuit recently explained that, generally speaking, "the U.S. Supreme Court and our court have held that, to the extent they are available, California's refund procedures constitute a plain, speedy, and efficient remedy." *Hyatt v. Yee*, 871 F.3d 1067, 1074 (9th Cir. 2017) (cleaned up) (citing *Franchise Tax Bd. of California v. Alcan Aluminium Ltd.*, 493 U.S. 331, 338 (1990)); *see also Jerron West, Inc.*,

9

129 F.3d at 1339; *Mandel v. Hutchinson,* 494 F.2d 364, 367 (9th Cir. 1974). On the specific issue of injunctive relief, a litigant challenged California's refund remedy as inadequate because it lacked injunctive relief, but the Supreme Court rejected the challenge. *California v. Grace Brethren Church* 457 U.S. 393, 415–16 (1982). In that case, the plaintiffs were churches and religious schools challenging an unemployment tax scheme on First Amendment freedom-of-religion grounds. *Id.* at 399–401. The plaintiffs argued that they needed injunctive relief because, even if they could obtain a refund after paying the tax, they would have to participate in administrative hearings in order to seek the refund, and that in turn would irreparably harm their First Amendment rights. *Id.* at 401. The Supreme Court rejected the challenge, reasoning that the plaintiffs could, after paying the tax, file a state court suit before any hearings took place. *Id.* at 415. More importantly for purposes of this case, the Supreme Court also explained that "we must keep in mind that at the time that it passed the Tax Injunction Act, Congress was well aware that refund procedures were the sole remedy in many States for unlawfully collected taxes." *Id.* at 416. In light of the remedial background against which Congress passed the Act, the Supreme Court broadly pronounced that "we do not believe that Congress intended federal injunctions and declaratory judgments to disrupt state tax administration when state refund procedures are available … ." *Id.* at 417.

It is true that, as Rubinas argues, federal courts have an unflagging obligation to exercise jurisdiction over a dispute when so authorized, and that the Tax Injunction Act ought to be applied with proper regard for the nature of the claim at stake.

10

But that does *not* mean that federal district courts can navigate around the Supreme Court's holdings that emphasize the breadth of the Tax Injunction Act by labelling the tax as a different type of tax—here, a tax based on online sales—and then carving out an exception to the Act even though the pay-first refund system is otherwise the same as the previously approved remedy in California.[5] To be sure, it is unfortunate that Rubinas—and perhaps many more small-business taxpayers like her—confronts an enormous practical obstacle in pursuing a refund. But this federal district court is not the proper forum in our hierarchical federal judiciary to overturn Supreme Court precedent. The absence of provisional injunctive relief does not trigger an exception to the Tax Injunction Act.

### 1. "Plain"

The next question is whether Rubinas has a "plain" remedy available to her in California courts through which she can pursue federal statutory and federal constitutional claims. The definition of a "plain" remedy refers not to simplicity but to *accessibility*: "For a remedy to be 'plain,' the procedures available in state court must be certain. A state remedy is not plain within the meaning of the [Act] … 'if there is uncertainty regarding its availability or effect.'" *Lowe*, 627 F.3d at 1156 (cleaned up).

---

[5]For example, during the motion hearing, Rubinas argued that the Internet Tax Freedom Act, 47 U.S.C. § 151 note, speaks in the present tense when prohibiting discriminatory taxes on online sales. But that makes no difference to the interpretation of the Tax Injunction Act. The text of the Act assumes that State tax collection is—present tense—ongoing: the Act instructs that federal district "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law" if a plain, speedy, and efficient State remedy is available. 28 U.S.C. § 1341.

In presenting the TRO motion, Rubinas has suggested that she might not be able to file suit in California courts because of a lack of taxpayer standing, which would mean California's remedy is not plainly available to her. Pl. Brief at 11 n.34. To support this argument, Rubinas points to what she labels the "restrictive taxpayer-standing doctrine" in California and worries that California state courts could characterize her as a "tax collector" rather than a "taxpayer." R. 13, Pl. Reply at 4. Rubinas' primary citation for this concern is a half-century-old case, *Scol Corp. v. City of Los Angeles*, 12 Cal. App. 3d 805, 809 (Ct. App. 1970). In *Scol*, a liquor retailer tried to challenge a use tax that had been levied on consumers but collected by the retailer. *Id.* at 808. The California appeals court decided that the retailer was not the taxpayer—the consumers were—and thus could not file suit against the tax. *Id.* at 809.

But *Scol* has not withstood the test of time, as demonstrated in both case law and in the Revenue and Taxation Code. "To the extent *Scol* stands for the proposition that a party lacks standing to challenge a tax unless it is the denominated 'taxpayer' under the statutory or regulatory scheme imposing the tax, it is outdated." *Sipple v. City of Hayward*, 225 Cal. App. 4th 349, 359 (2014) (cleaned up) (citing *TracFone Wireless, Inc. v. County of Los Angeles*, 163 Cal. App. 4th 1359, 1364 (2008)). California courts have moved away from *Scol*'s rigid distinction between taxpayers and non-taxpayers towards a fairness test that is all but certain to come out in Rubinas's favor. "The *TracFone* court held that concerns of fairness require the courts to ensure the taxing authority is not unjustly enriched at the expense of persons left without a remedy." *Sipple*, 225 Cal. App. 4th at 360 (cleaned up). Indeed, Rubinas's situation

12

resembles that of the plaintiff in *TracFone*, in which a company paid taxes owed by its customers, later determined it should not have paid those taxes, and had no way to contact those customers. *TracFone Wireless, Inc.*, 163 Cal. App. 4th at 1365. The California appellate court held that the "facts adequately alleged that appellant would be left without a remedy if denied standing on the ground that it was not the 'taxpayer.'" *Id.* Similarly, Rubinas has alleged that her business paid taxes that she now believes she did not owe, and that she has no contact with customers; indeed, she is generally forbidden by her agreement with Amazon from interacting with them. Rubinas Decl. ¶ 4, Compl. generally.

More importantly, the California revenue code has been specifically amended to fix the harsh result arising from *Scol*. In 1993, the California legislature amended the Revenue and Taxation Code section on refund claims to refer to "persons required to file returns," rather than "taxpayers filing returns." Cal. Rev. and Tax. Code § 6902(a)(1), (2); 1992 Cal. Legis. Serv. Ch. 902 (S.B. 1608). All agree that Rubinas's corporation, IJR Corporation, was required to file tax returns. So § 6902(a)(2) authorized IJR to initiate a claim for refund. During the motion hearing, Rubinas argued that there still was room for doubt on standing, because § 6902 might simply be a statute of limitations provision rather than an authorization to initiate a claim for a tax refund. It is true that § 6902 sets a time limit (depending on whether the returns are file annually or not) on when to file a claim for a refund with the Department of Tax and Fee Administration. But § 6902 is the *authorizing* provision for refund claims of sales and use taxes. That section resides in Article 1 (entitled "Claim for

13

Refund) of Chapter 7 (entitled "Overpayments and Refunds"), and Rubinas points to no other statutory provision that would serve as the provision that creates the refund-claim process. Nor does she point to any other provision that would otherwise restrict the refund-claim process solely to taxpayers instead of tax-return filers. What's more, the statutory provision that authorizes the filing of a post-agency-process lawsuit simply says that the "*claimant* may bring an action" against the Department for the refund. Cal. Rev. and Tax. Code § 6933 (emphasis added). So under this statutory framework, Rubinas would be the claimant in the Department process and then can file a lawsuit in California state court after the agency's decision. Taxpayer standing is not sufficiently in question to render the California state courts as inaccessible.[6]

### 2. "Speedy" and "Efficient"

On the "speedy" and "efficient" requirements of the California remedy, speed and efficiency are measured relative to federal-court remedies. On speediness, a state court remedy should not take significantly longer than a federal court one. *Hyatt v. Yee*, 871 F.3d 1067, 1073 (9th Cir. 2017). Here, Rubinas asserts—without citation or supporting evidence—that a refund action "takes years." Pl. Brief at 9. As the proponent of the extraordinary relief of a temporary restraining order, Rubinas bears the burden of proof on this point. But there is simply no record evidence that the California remedial process will take "years." Even if it did, the key question—whether the

---

[6]It is worth noting that California's tax-challenge system offered the opportunity for Rubinas to mitigate the levy. When funds were levied from her account, Rubinas could have contacted the Taxpayer Rights Advocate to assert a hardship, which could have resulted in the return of some of the money. Cal. Rev. and Tax. Code § 7094(b)(1)(A). This is separate and apart from the potential payment plan that Rubinas might have been able to arrange. *Id.* § 6832.

14

state process would not be speedy and efficient *relative* to federal courts—would remain unproven.

Relatedly, on efficiency, Rubinas has also not shown that the California remedial process "imposes an unusual hardship requiring ineffectual activity or an unnecessary expenditure of time or energy." *Yee*, 871 F.3d at 1073. Indeed, California law requires that the Department act within six months of the filing of the refund claim; if it fails to do so within that six-month deadline, then Rubinas can go file suit in state court. Cal. Rev. and Tax. Code § 6934. On the current record, there is no reason to think that California does not offer a speedy and efficient remedy. Lastly, it is worth noting too that the Supreme Court and Ninth Circuit cases upholding California state remedies as sufficient under the Tax Injunction Act have not criticized the speed or efficiency of the state process. *See Grace Brethren*, 457 U.S. at 413; *Hyatt*, 871 F.3d at 1073; *Jerron West*, 129 F.3d at 1339. Because the Tax Injunction Act applies, there is no subject matter jurisdiction to require California to return the levied funds.

### B. Sovereign Immunity

Even if subject matter jurisdiction somehow did apply despite the Tax Injunction Act, California's sovereign immunity would preclude the return of the already-seized funds. "The eleventh amendment bar extends to suits for money damages against state officials sued in their official capacities, because a judgment against a public official 'in his official capacity' imposes liability on the entity that he represents...." *MSA Realty Corp. v. State of Ill.*, 990 F.2d 288, 291 (7th Cir. 1993) (cleaned up). To the extent that Rubinas is suing Nicolas Maduros, the Director of the

California Department of Tax and Fee Administration, in his official capacity, the lawsuit is really against the State of California.[7] So the Eleventh Amendment forbids Rubinas from seeking money damages against California in this case.

Against this, Rubinas contends that the claim for a return of the already-seized funds is better characterized as a claim for a "return of property," which would not be barred by the Eleventh Amendment under a Ninth Circuit case, *Suever v. Connell*, 439 F.3d 1142, 1143 (9th Cir. 2006). The plaintiffs in *Suever* sought the return of funds that they claimed California had seized under its escheat statute. *Id.* at 1147. According to the property owners, California had "unlawfully used 'auditors' to coerce financial institutions into paying or delivering property ineligible to be escheated. For instance, [the] financial institutions knew some of the class members' addresses at the time of transfer." *Id.* at 1145. California law defined "escheat" as, among other things, the "vesting in the state of title to property the whereabouts of whose owner is unknown," Cal. Civ. Proc. Code § 1300(c). So California should not have deployed escheat to seize property from owners for which the State had address information. *Id.* at 1145. The Ninth Circuit held that the Eleventh Amendment did not bar the lawsuit "insofar as the claims request the return of the class's property." *Id.* at 1147.

---

[7]Rubinas's opening brief specifically targeted the Department (that is, California), rather than Maduros in his *individual* capacity. *E.g.*, Pl. Brief at 15 ("the Court should enjoin CDTFA from seizing Ms. Rubinas's property, order CDTFA to lift any existing levy on her property, and order CDTFA to return the property it has already seized"). It was not until the reply brief that Rubinas first asserted that Maduros could be ordered as an *individual* to return the levied funds. Pl. Reply at 6. The failure to present the argument in the opening brief means that, for the purposes of the TRO, the argument is forfeited. In any event, it is likely that qualified immunity would prevent finding Maduros liable in his individual capacity, in light of the myriad questions about the merits of the federal claims, both substantively and also whether there is even a private cause of action under the Internet Tax Freedom Act.

Specifically, sovereign immunity was inapplicable to funds that had not yet been "permanently escheated" because "the State held such funds in custodial trust for the benefit of property owners—the funds were not State funds." *Id.*

Here, the facts differ from *Suever* in important ways. First, the funds seized from her account were not escheated. They were taken to pay a tax liability that had been assessed against IJR Corporation and which she had, through her accountant, admitted. Hale Decl. ¶ 5. Second, *Suever* emphasized that the funds in question were being held in *trust* and had not yet become State funds. In contrast, here the funds from Rubinas's account have been conveyed, according to California, to the California State Treasury in accordance with California Revenue and Taxation Code § 7101. Def. Brief at 9. So they are now funds belonging to the State of California, not held in trust for the taxpayer. No federal court has the judicial power to order California to pay Rubinas out of its treasury without violating the Eleventh Amendment. *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 689–90 (1982).

Instead, this case more closely resembles another tax case, *Ford Motor Co. v. Dep't of Treasury of Indiana*, 323 U.S. 459, 460 (1945), *overruled on other grounds by Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613 (2002). In *Ford Motor Company*, the car manufacturer sought a refund of income taxes that it had paid to Indiana. *Id.* at 460. Under Indiana state law, Ford Motor should have filed for a refund claim with the state tax agency, and then filed a lawsuit in Indiana state court for a refund. *Id.* at 463, 465. Instead, arguing that it wished to present claims under

17

the Commerce Clause and the Fourteenth Amendment, Ford Motor brought suit in federal district court. *Id.* at 460-61.

The Supreme Court held that the Eleventh Amendment barred the suit. 323 U.S. at 463–64. The Ford Motor Company was seeking a "refund," and thus was seeking money from the State itself. *Id.* at 464. "[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Id.* Just so in this case: Rubinas is seeking the return of a tax payment held by California. So the Eleventh Amendment bars the federal courts from providing the remedy that Rubinas seeks.[8]

### IV. Conclusion

The Plaintiffs' motion for a temporary restraining order is denied. To move the case forward, the formal next steps are (1) to consider the motion for preliminary injunction; and (2) to set the answer or Rule 12 motion deadline. In light of this Opinion, however, on the preliminary-injunction motion, the parties shall confer on whether any supplemental briefs are really needed to decide it. The Court believes that the answer is no, because the rationale should apply equally well to the preliminary-injunction motion, but the parties may express their positions on it. Similarly, if the rationale equally applies to the inevitable motion to dismiss for lack of subject

---

[8]The aspect of *Ford Motor* that has been overruled is not pertinent here. Specifically, *Ford Motor* held that Indiana had not waived sovereign immunity even though it had not raised the issue until after it litigated in federal court and lost. 323 U.S. at 469. In *Lapides*, the Supreme Court held that a State indeed does waive sovereign immunity if it voluntarily invokes the jurisdiction of a federal court, such as by removing a case from state court to federal court. *Lapides*, 535 U.S. at 622-23.

matter jurisdiction, then perhaps the most efficient way to proceed would be for the Court to enter a dismissal on those grounds. That would be the fastest route for Rubinas to appeal to the Seventh Circuit. In any event, the parties shall confer and file a Joint Status Report setting forth the proposed litigation schedule, including areas of agreement and subjects of disagreement. The Joint Status Report is due by January 29, 2021. To track the case only (no appearance is required, the case will not be called), a status hearing is set for February 5, 2021 at 8:30 a.m.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: January 18, 2021